May I proceed, Your Honor? Yes, you may. Thank you. Your Honor, my name is Phillip Mann. I'm here representing the appellant Sandy Routt in this case. And as pointed out in our briefs, the underlying facts in this case are largely undisputed. Ms. Routt is the owner of several copyrights on photographs. There's no question about that. Those photographs have been submitted for proper copyright registration. Those are in place. There's no question that her copies, her photographs have been improperly copied several hundred times by at least 150 other people that we know of so far that identify themselves as Amazon affiliates. These facts are largely undisputed. What is disputed is whether Amazon... Have I got it right, Counsel, that the pictures never appeared on Amazon's site? If you type Amazon.com on your computer, you pull up Amazon, you'd never see them. The pictures only appeared on the affiliate sites? Generally, that's correct, Your Honor. That's our understanding. If we had direct evidence that Amazon itself was putting this on its site, this would be a much easier case. The real issue here is whether Amazon should bear responsibility for the actions of its admitted affiliates. The district court below said on a 12B6 motion, no, you cannot prove this. Go away. And that's what brings us here today. Obviously, we disagree. And so doesn't this hinge on whether Amazon can control the affiliates and have some way to stop the affiliates other than saying they're going to terminate them from their association? Well, the way the question is phrased, I would disagree with that. That, again, gets to the crux of the issue. Let's get to the crux because we don't have much time. Right. The court does say the Fono Visa case that we rely on says that Amazon has to have some control. We pointed out in our amended complaint 18 pages of fine print that Amazon has in its affiliate agreements that, in our view, show all sorts of control, what they can put on their websites, what they can say, what sort of subjects may be discussed on the websites. Amazon, quite properly, is worried about its image and its name and wants to make sure that its affiliates don't tarnish that. So it makes sense that they would have all sorts of control. Well, then let me ask you just this question and then give me a yes or no answer, okay? Because I think this goes to really the point of why we're here. Does Amazon have any means of stopping an associate from infringing on Ms. Rauch's copyrights other than threatening to terminate them from their enrollment into the program? I believe they do not have that. That is the control they would have. I don't think there's any evidence that Amazon physically goes to their websites and can add content or remove content. If the answer is no, what's your best argument on how you survive here? Our best argument is we have to take a step back from this and put the horse in front of the cart where he belongs. This all stems from vicarious liability. In other words, does Amazon induce the infringement? And our theory is by creating the affiliate program, that is the sole basis. Where is that in the law, the requirement? That goes back to the phone and visa case, which is based on the Dansall cases that come out of the Second Circuit that go back, I believe, certainly long before I was practicing law. They're sort of the granddaddy cases. Let's talk about the Perfect Ten versus visa case. Certainly. Because it seems like it's rather relevant, and it looks like you, in your briefing, attempt to distinguish that case. And I guess I'd like to go into that because it seems like the district court thought that it was controlling me. I don't think you have a different view of that. But if I understand you correctly, you suggest that your case is distinguishable, right, because the Amazon Associates operating program is lengthy and includes, I guess, numerous rules the associates must follow. But do you have any basis, I guess, for asserting that the agreements between the credit card defendants and the merchants in visa were any less detailed or restrictive? No. Our theory, that does not accurately describe our principal distinguishing point on the Perfect Ten cases. What we're saying is in the Perfect Ten cases, visa had a reason to exist independent of the Perfect Ten infringing websites. The infringing websites in Perfect Ten, more importantly, they had a reason to exist other than a connection with a visa. They were selling pirated copies of photographs. That's how they would make money is by sort of like copying a CD or copying a movie and selling knockoffs. That's what kept those websites in business. The principal argument, and what I'd like to get across here because I think this is critical, is the only reason these websites that we're complaining about exist in the first place is solely to serve as affiliates for Amazon. In other words, if the Amazon affiliate program that brings these websites into existence in the first place, that's their only purpose for existing. We've gone to them. We've tried to buy products on those websites. They say, no, we don't have products for sale. What it does do is it links you into Amazon. If Amazon makes a sale as a result of that link, Amazon will then send a check to these websites. That's how they come into existence. That is the principal difference. In the Perfect Ten cases, the argument was, well, Google helps people find infringing websites just because they have a search engine. Therefore, Google should bear responsibility. I said, no, Google exists for, that's too tenuous a connection. The argument was Visa should bear responsibility for the copyright infringement because they facilitate the transfer of money to the infringing websites. Again, the court said, and I think properly, no, again, that is too tenuous a connection. Here, our argument is the only reason these websites come into existence is because Amazon has the affiliate program, and some of these unscrupulous people have figured out that if I can copy somebody else's website, pretend to be a store, sign up as an Amazon affiliate, and send business to Amazon, I will be rewarded with a check. Now, we never got any discovery. We never got out of the starting block on this, so I haven't had a chance to develop the evidence, but in a nutshell, that is our theory, and that, I think, is how we distinguish what happened in Perfect Ten from what's going on in this particular case. Counsel, I have a problem understanding one particular word in the operating agreement between Amazon and the website. There's this word where page 131 of the excerpts where the affiliate consents to Amazon monitoring, crawling, and otherwise investigating your site to verify compliance with this operating agreement and the operational documentation. I don't know what crawling means in that context. Can you tell me? That may be a question better directed to Amazon's counsel. I believe crawling means just going around, checking out different websites to see what's on there. I don't know if it does, because that's what monitoring would mean. Well, again, Your Honor, I wish I could answer that. I guess you're just guessing. I am, Your Honor. Am I right? I do not know what that word means, and that would be better. I didn't write that document. That would be a question probably better directed to Amazon's counsel. So I would like to reserve the balance of my time, Your Honor. All right. Thank you. Good morning, and may it please the Court. My name is Jim Grant. I'm here on behalf of Amazon.com. I'm joined by my partner, Ambika Doran, and by Charles Wright, who is the senior counsel at Amazon. Your Honor, I think this case is relatively straightforward, and your questions, Your Honor, directly go to the issue of the case. That is that this Court has decided these issues previously in the Perfect Ten cases, both Perfect Ten v. Visa and Perfect Ten v. Amazon. Counsel, let me ask you a question about Visa. At the beginning of Visa, beginning of the opinion where it discusses the critical matters, the Court says that you can't just read the words of the other opinions. You have to look at the facts, and the opinion is fact-based. The general language later on in Visa seems quite supportive, but the language that really struck me in Visa was the language about direct connection, where they say there's no direct connection to the infringement at page 796 of Visa. I was thinking about what that meant, and it looked to me like Visa's relationship to the infringer is much less direct than the associates and Amazon's relationship. Visa functions like a bank. If somebody sells fake jewelry on somebody else's premises, like that flea market case that we had, the Visa case is like suing the bank that processed the checks. Visa operates like a bank, and instead of checks, you have credit cards. And I thought that it would be like suing not the flea market, which has the direct connection to the infringer, just as Amazon has the direct connection to the affiliate. It would be like suing the flea market operator's bank for processing checks that come to it as rent for the space or commissions on the items sold from the infringer at the flea market. That would seem to me to distinguish Visa. Why wouldn't it? What am I missing there? Because, Your Honor, I believe that Visa's connection to the websites, the infringing websites in that case, which were merchants, was actually direct. There's a direct agreement between Visa's member banks. And remember, the defendant in Visa is Visa, the card association, plus its member banks that administer the card program and all the rules. So there is a direct agreement between those member banks and the websites. And, in fact, those agreements are very detailed, as Judge McGeeh's question pointed out earlier. So there was means to monitor the actions of the websites. And, in fact, Visa could have terminated the relationships and stopped processing payments. And this Court said that was not sufficient. Now let me draw the comparison. Why would the flea market's bank monitor the flea market? I mean, if the flea market gets its checks processed at Flea Market Inc.'s bank, why would the bank send over anybody to the flea market to look at what they're selling there? Because the relationship of the card association and the member banks is to impose rules. They have rules as well, participation rules, about what merchants can and can't sell. And if they violate those rules, the mer- I have a checking account, and there's an agreement. I think all of us probably have checking accounts with agreements, and they don't say anything about not selling anything that infringes on somebody's copyright or trademark. And I can't imagine the bank would employ anyone who even knew anything about that. Well, what I'm suggesting, Your Honor, and this is actually set forth in the Perfect Ten versus Visa case, is that there are direct agreements when you're setting up a credit card processing arrangement. So the banks do have direct agreements with the websites, and they can monitor their activities, and they can cancel their payment processing. And all of those things this Court said- Yeah, if Visa discovers that it's providing credit card payments for some overall criminal operation, a gambling den or a house of prostitution or something like that, maybe it'll say no more Visa for you. But I've never heard of a bank monitoring copyright violations or trademark violations. Actually, within the rules of- You're saying because they could, if they wanted to, and they could cut them off, that that's like this case? It is like this case in that, yes, they could cut them off, Your Honor. That's correct. Okay. Now help me with my other question that I asked your adversary. What does crawling mean in the operating agreement? Crawling is a tactical means of having an automated system that will go out and look at another website and can do some testing looking at what's in that website. It's not a detailed- Could you explain that a little more? You said an automatic system for looking at the website. What does that mean? I'm not the tech expert, Your Honor, so I apologize. But it's having one computer go out to sample another website, to look at a website, to look at what activities are on that website, but not a detailed monitoring. But it is one aspect of the provision of the agreement. At a minimum, I guess I'd like to know, what additional level of control over its associate would Amazon need to exert in order to be exposed to vicarious liability? If you could give me some concrete examples. I think the question, Your Honor, goes directly to the issue of this case because the element of control Amazon does have is the right to terminate the associate agreement. The Amazon case, in the context of the Google case, said that's not sufficient. Let me respond. The element of control that Amazon would need would have to be something considerably more. And the case is laid out. It would need to be that Amazon can manage and direct much as a principal manages an agent. It could say, you need to take that image down off of the website. You need to shut your website down, and Amazon would have the power to do that. In fact, Amazon could do none of those things with affiliates. Amazon cannot take the website off the net. Amazon cannot take images off the websites. Amazon cannot stop that website, if it's infringing, from continuing to do so. It can stay on. Well, sure they can. They can fire them. And since the website has no existence except as an Amazon affiliate collecting commissions from Amazon, that's about as much control as you'd want. Let me answer that question by picking up on the second part. The allegation, the argument that Mr. Mann makes about the website existing only to infringe is not in the complaint. There has never been such an allegation. It's made of whole cloth, and it arose for the first time in a reply brief in this case. And, in fact, it makes no plausible sense whatsoever. Amazon does not set up or encourage or promote websites to infringe copyrights linked to Amazon, so customers can be frustrated because they can't buy a product in that way. Amazon, in fact, under its associates agreement, says you are not to violate copyrights and says if, in fact, you link to a product that is not on Amazon, you don't get paid. So the suggestion that he makes that websites exist solely for this purpose is simply wrong and unsupported in the record. And twice the district court examined the complaint by the plaintiff. I understood what you said before the word so, and I understood the words you said after the so, and I didn't understand why so was the appropriate word to connect them. It sounded like you laid out various additional means by which Amazon can monitor and control the website, which is consistent with the operating agreement. And then he said that means it doesn't. What I meant to say, Your Honor, and I apologize if I didn't say it clearly, is Amazon ultimately has the right to terminate the agreement, but that's the only right they have. Amazon does not have the right to take something down off the Internet. Amazon does not have the right to block a site altogether. And Amazon has no power whatsoever to stop that infringing website from continuing on infringing if it chooses to, even after it's terminated. And that's what this Court said in both the Perfect Ten Amazon case and the Perfect Ten Visa case was the defining limit, to Judge McGeeh's question, between the measure of control that's necessary and that which is not necessary and not enough. And the other problem, let me point this out from the case law as well, is that the standard that plaintiffs are suggesting here also fails to show a practical ability to monitor and control someone else. And the reason is this. While the website operator might be able to go out and monitor his premises and find out whether people are selling infringing goods, no one reasonably can monitor the entire Internet. And that's what plaintiffs suggest would have to happen here. Amazon would have to monitor its 3,000, its 3 million affiliates, somehow determine whether there's copyrighted materials, somehow determine whether there's some infringement, and then somehow do something about that that cannot stop it from happening. Your Honors, I suggest the District Court was entirely correct when it twice examined Ms. Raut's complaint. I'll follow this Court's precedents and dismiss it, and that this Court should affirm. Thank you. You have two minutes and seven seconds. Your Honor, I would just like to follow up a little bit on what Judge Kleinfeld was asking. In the visa case, they point out that if you terminate the visa agreement, the infringing websites would continue on in business. Why? Because they're in the business of selling pictures that are copied. That's where the principal income comes in. If you terminate the visa agreement, those websites continue on in existence. Our theory is if Amazon terminates the affiliate agreement with the infringing websites, those websites are out of business. Again, the only reason these websites exist is to send business to Amazon in the hopes of getting a royalty check to the extent they succeed. That was pointed out in the visa case. That is what's critical here, and that's why the threat of termination carries effectively a death sentence for the websites. If you say that's not control, that's not a threat, well, I guess we disagree on that, but that is a point that was actually made in the visa case, and I think it's a critical distinguishing point. We also pointed out in my reply brief that there are some fixes Amazon can do to remedy this. For example, make sure that these are real websites. Make sure that they have a presence. Require them to designate somebody in the United States that can be sued so we don't have the problem of unknown people in overseas countries are doing the infringements, and we're stuck here because there's nobody here to sue. There are a lot of things Amazon can do to fix this, and I think that the district court throwing this out before we even had a chance to do any discovery and develop our case was wrong. I would ask that this court reverse and remand the case for further proceedings. Thank you. Thank you, Mr. Mahan. Thank you for your arguments, both of you. Very helpful. The case of Routt v. Amazon is now submitted.
judges: Alarcon, Kleinfeld, Murguia